FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

MAY 31 2010

at 6 o'clock and 20 p.m. Som
SUE BEITIA, CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| HRPT Properties Trust, et al., | ) ) ) | CIV. NO. 09-00375 SOM/KSC |
| Plaintiffs, | ) ) ) | ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, DENYING DEFENDANT LINDA LINGLE'S SECOND COUNTER |
| vs. | ) ) | MOTION FOR SUMMARY JUDGMENT, AND DENYING INTERVENOR- |
| LINDA LINGLE, in her official capacity as Governor of the State of Hawaii, | ) ) ) ) | DEFENDANT CITIZENS FOR FAIR VALUATION'S COUNTER MOTION FOR SUMMARY JUDGMENT |
| Defendant, | ) ) | |
| and | ) ) ) | |
| Citizens for Fair Valuation, | ) ) | |
| Intervenor-Defendant. | ) ) ) | |

ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT,
DENYING DEFENDANT LINDA LINGLE'S SECOND COUNTER MOTION FOR
SUMMARY JUDGMENT, AND DENYING INTERVENOR-DEFENDANT CITIZENS FOR
FAIR VALUATION'S COUNTER MOTION FOR SUMMARY JUDGMENT

I.      INTRODUCTION.

The question before this court is whether a state

statute relating to commercial and industrial leases is

constitutional.  It is not.

The statute in issue is Act 189, passed by the State of

Hawaii Legislature in 2009.  This statute affects leases of land

owned by only a single entity, Plaintiff HRPT Properties Trust,

through its subsidiaries (collectively, "HRPT").  These long-term

business leases require the lessor and lessees to periodically

renegotiate rent.  A number of these rent renegotiations were scheduled to occur between 2009 and 2013.  As the time for the 2009 rent renegotiations neared, Intervenor-Defendant Citizens for Fair Valuation ("CFV Lessees") successfully lobbied the Legislature for passage of a law applicable only to HRPT that would require any appraiser involved in a rent determination under an HRPT lease to consider factors not required by HRPT's leases.  The newly imposed factors were clearly designed to favor businesses leasing land from HRPT and in fact substantially prejudice HRPT.

This court is not persuaded by CFV Lessees or Defendant Governor Linda Lingle that Act 189 only clarifies or reinforces the intent of the original contracting parties.  Act 189 changes the parties' bargain.  In the process, Act 189 fails to achieve its purported purpose, which was "to help stabilize Hawaii's economy."  By imposing a change in the lease that deliberately favors HRPT's lessees and disadvantages HRPT and that is applicable to a single landowner, Act 189 runs afoul of the Contract Clause and the Equal Protection Clause of the United States Constitution.  Indeed, before Act 189 was passed, Governor Lingle urged the Legislature not to pass the law, warning that it was unconstitutional.  She now vigorously argues the opposite. This court declares Act 189 unconstitutional and grants summary judgment to HRPT.

II.        BACKGROUND.

HRPT is a recent successor to what was once one of Hawaii's largest private landowners.[1]  For decades, the Samuel Damon Estate leased large tracts of commercial and industrial land to lessees under long-term leases calling for rent to be renegotiated at stated times.  The renegotiated rents were to remain in effect for fixed periods.  See D. Hebden Porteus Affid. ¶ 2 (Jan. 8, 1993) (Doc. No. 67-4).  For example, Damon Estate might have a fifty-year lease, with rent set for an initial ten-year period.  The parties would then renegotiate rent for subsequent ten-year periods, with each renegotiation occurring before the end of the prior period.  While Damon Estate continued to own the land for the duration of the lease, a lessee could erect structures that it then owned and was responsible for maintaining.

How to determine rent was a major point of discussion between Damon Estate and its lessees.  In 1949, one of the leases between Damon Estate and its lessee provided that, if the parties did not agree to rent, the matter would be submitted to arbitration.  Ex. V at 3 and 5, attached to CFV Lessees' Concise

_____

[1] Andrew Gomes, "Death of Damon Heir Signals the End of Trust," Honolulu Advertiser, Nov. 10, 2004, available at http://the.honoluluadvertiser.com/article/2004/Nov/10/bz/bz04p.html (last visited May 19, 2010).  A copy of this web page will be placed in the case file as a separate filing.

Statement.  The 1949 lease further stated, "PROVIDED, HOWEVER, and it is expressly agreed, that the rental to be paid shall be based on the value of the land, exclusive of the improvements placed thereon by the Lessee, but in no event to be less than originally provided for in the first ten year period."  Id. at 6.

In 1959, Damon Estate reviewed the provisions of its standard lease form.  Porteus Affid. ¶ 2.  That review is described in an affidavit signed in 1993, thirty-four years after the review had occurred, by D. Hebden Porteus, who became a Damon Estate Trustee in 1957 and had continued to be a Trustee thereafter.  Porteus, now deceased, provided that affidavit in 1993 in connection with a rent determination under a particular Damon Estate lease.  As he put it, "This affidavit is provided in order to explain the intentions of the Estate in drafting the language of the ground lease relating to appraisal and the business philosophy of the Estate in negotiating ground lease rent reopenings."  Id. at p. 1.

According to Porteus, during the 1959 review, the lessees and Damon Estate proposed different language regarding the rent determination process.  The lessees proposed language stating that, if the parties failed to agree on rent, the rent was to be determined by appraisers who were to set rent "equal [to] a fair return on the then market value of the demised land, exclusive of improvements thereon."  Id. ¶ 4.  Damon Estate

4

Trustees saw the lessees' proposed language as needlessly focusing the rent determination on two issues: "(a) market value of the land; and (b) the 'fair' rate of 'return.'" Id. ¶ 5. The Trustees proposed that the appraisers set rent based on the "amount of rent," rather than the value of the land and the rate of return. Id.

Ultimately, the following language was included in all Damon Estate ground leases:

> In case the parties hereto shall fail to
> agree on the net annual rent hereunder
> payable . . . said rent shall be such fair
> and reasonable rent for the demised land
> (exclusive of buildings) as shall be
> determined by three impartial real estate
> appraisers.

Id. ¶ 1. This is the language in the leases before this court.

The leases require the lessor and lessee to attempt to reach an agreement on rent ninety days before the commencement of any new rental period. Ex. 1, attached to HRPT's Concise Statement. If the lessor and lessee fail to agree on rent, the matter of rent must be submitted to three appraisers for their determination of "fair and reasonable" rent. Id. The parties then provide testimony and information to the appraisers concerning what the rent should be. See Ex. HH, attached to CFV Lessees' Concise Statement (an appraisal report that describes actions taken by the appraisers, which included inspecting the properties, "hearing testimony from the parties of interest,

5

conducting independent studies, and meeting, discussing, and sharing findings and conclusions"). Thus, the appraisers determine rent through the process normally followed in an arbitration.

According to Porteus, it was "never the intent or understanding of the parties that 'fair and reasonable' rent defined in terms of the lease be anything other than market rent, as any rent below market would be unfair and unreasonable to the Estate, while any rent above market would similarly be unfair and unreasonable to the lessee." Porteus Affid. ¶ 6. He stated that market rent was to be determined by "multiplying the market rate of return by the fee simple value of the land." Id. ¶ 7. He also noted:

> 9. The arbitration provision also very clearly provides that the ground lease rent shall be based on the demised land "exclusive of buildings." Our rents are not based on the buildings because the lessees (not the Estate) own the buildings and make the decisions about the buildings which they choose to develop on the property. As a ground lessor, only, the Estate's rents are not increased or decreased as a result of the value or age of the improvements the lessee may have elected to place on the property, nor are the lease rents affected by the lessee's track record or ability to make a profit operating the property.

Id. ¶ 9.

Notwithstanding the lease terms, Porteus said that, in an attempt to reach agreement and avoid submitting the matter to

appraisers, Damon Estate sometimes offered rents to lessees at
below-market rates.  According to Porteus, this was done to
establish a "spirit of cooperation" with lessees, not because the
Damon Estate Trustees considered rent separate from market value.
Id. ¶ 11.  This approach is echoed in statements by Damon Estate
Trustees involved in more recent rent negotiations.  Timothy E.
Johns Decl. ¶ 7 (Doc. No. 67-6) (Feb. 8, 2010) (noting that Damon
Estate made a business decision to offer lessees rents at below
market rates); David M. Haig, Paul Mullin Ganley, Walter A. Dods,
Jr. Decl. ¶ 7 (Doc. No. 67-5) (Feb. 8, 2010) (same); Exs. Y, Z,
AA, BB, attached to CFV Lessees' Concise Statement (Damon Estate
letters to lessees informing lessees that since the parties could
not agree on rent the matter would be submitted to appraisal, and
withdrawing all compromise proposals).  Pursuant to this
philosophy and business decision, Damon Estate sometimes
negotiated rents more favorable to lessees than might have been
established through arbitration.  Porteus Affid. ¶ 12.

In 2003, HRPT purchased land from Damon Estate.  HRPT
now owns more than 50,000 square feet of commercial and
industrial property in Hawaii.  David M. Lepore Decl. ¶¶ 4, 5
(Doc. No. 67-7) (Sept. 28, 2009).  HRPT bought this land subject
to Damon Estate's long-term leases.  Id.  Among the lessees are
such nationally recognizable entities as AT&T Wireless, Coca-
Cola, Sears Roebuck & Co., Sony Electronics, Inc., and Time-

Warner Entertainment.   Numerous prominent Hawaii businesses are also HRPT lessees, including American Savings Bank, Bank of Hawaii, and First Hawaiian Bank, as well as Servco Pacific, Inc., which, among other things, distributes Toyota vehicles in Hawaii. Ex. 8, attached to HRPT's Concise Statement.   The leases, which ran for about fifty years, had an average remaining term of twenty-two years at the time of HRPT's purchase.   Id. ¶ 6 ("When HRPT purchased most of the Damon Estate land, the Lease Contracts had an average remaining term of 22 years.").

According to many of the lessees, HRPT, as lessor, has been more aggressive and confrontational than Damon Estate was. HRPT has also had lessees sign confidentiality agreements before beginning rent renegotiations.  According to the lessees, the confidentiality agreements have prevented them from obtaining "fair market rent" by limiting their access to information about comparable property values from other lessees.   Ex. 3 at 3, attached to HRPT's Concise Statement.   Many lessees view HRPT as a mainland firm in Hawaii only to "make a profit."   Id. at 2. While the lessees say Damon Estate made fair and reasonable rent renegotiation a central element of its business philosophy for more than thirty years, they view HRPT as using its "monopolistic holding to restrain the free trade of negotiation to [its] exclusive benefit."   Id. at 3.   Thus, the lessees say, HRPT prefers the appraisal process over negotiation.

Many of the leases between HRPT and its lessees called for rent renegotiations in 2009. As the renegotiation period neared, a number of lessees formed a nonprofit organization, Citizens for Fair Valuation ("CFV Lessees"). CFV Lessees sought help from the Hawaii Legislature to deal with what the lessees characterized as HRPT's refusal to negotiate in good faith.

CFV Lessees argued to the Legislature that HRPT was insisting on using the appraisal process. Ex. 3 at 3, attached to HRPT's Concise Statement. While the leases provide for appraisal if the parties fail to agree on rent, CFV Lessees claim that the appraisal process is unfair, because HRPT allegedly has "inside information" that it uses to influence appraisers. Id. Further, CFV Lessees say that, as "Hawaii's pool of qualified appraisers is small and many will look to HRPT as a steady and lucrative source of business," HRPT benefits unfairly from the appraisal process. Id. Casting HRPT as an outsider and themselves as local, CFV Lessees or its supporters advanced the notion that HRPT was "not accustomed to doing business here" and "care[d] little for the 'Aloha' that comes with the responsibility of owning Hawaiian land." Ex. 8 at 5, attached to HRPT's Concise Statement. CFV Lessees submitted legislative testimony stating that, "to be 'fair and reasonable' HRPT needs to take into consideration the agreed upon use of the land under lease, other newly signed ground leases for similar properties,

the rates currently in force for neighboring properties, the general condition of the neighborhood, and the overall condition of the economy." Id. at 1.  CFV Lessees argued that rent should be determined with consideration of the current use of the property.  Id.

   After much debate, the Hawaii Legislature passed Act 189.  The legislative history of Act 189 is summarized in an earlier order by this court in this case.  See HRPT Properties Trust v. Lingle, 676 F. Supp. 2d 1036, 1040-41 (D. Haw. 2009).[2] To recap, Act 189 itself included the following stated purpose:

> to help stabilize Hawaii's economy by addressing some of the burdensome or vague provisions of existing commercial and industrial leases of certain lands within urban districts by clarifying provisions in long-term commercial and industrial ground leases without substantial reduction in the economic benefit to the owners or impact on their ownership of the land, without impairing their lease contracts, and without the taking of any property rights without due process of law.

---

   [2] HRPT has previously noted that Rep. Calvin Say, Speaker of the House, has financial ties to a subtenant on HRPT land, and that his alleged failure to disclose what HRPT views as his conflict of interest violates House ethical rules.  See HRPT's Original Memorandum in Support of Motion for Summary Judgment, Document 14-1 at 4-5 n.3.  As alleged violations of House ethical rules are clearly not within this court's jurisdiction, HRPT appears to be citing this circumstance to support its argument that Act 189 deliberately targeted HRPT, not to obtain action by this court against any particular legislator.  HRPT quite properly did not name any individual legislator as a party to this litigation.

Act 189 also included the following legislative "findings":

> The legislature finds that small businesses are an essential element in strengthening and diversifying Hawaii's economy and creating jobs for our people. More than ninety-five per cent of all Hawaii establishments are small businesses, and they provide jobs for sixty per cent of all Hawaii employees.

> The legislature further finds that despite their contribution to Hawaii's economy, small businesses are at a disadvantage in terms of land ownership. The commercial and industrial properties that exist within the State's urban districts are primarily owned by a few landowners. These landowners control large tracts of land and retain their ownership by means of leases to small businesses, which in turn supply services and products to the communities within or adjacent to the commercial and industrial properties. Without these neighborhood businesses, consumers would be compelled to travel long distances and expend large amounts of time and effort to locate these needed services and products.

> . . .

> The legislature further finds that small businesses often depend on commercial and industrial leases, which may contain provisions that are vague or onerous and that eventually force these businesses to relocate to rural areas and away from the urban centers.

> The legislature further finds that the proximity of small businesses to urban communities serves to stabilize Hawaii's economy, especially during the Unites States' current recessionary period.

Governor Lingle advocated against passage of Act 189,

arguing at the time that Act 189 was unconstitutional.  Having been unsuccessful in that regard, she now argues that Act 189 complies with all constitutional requirements.

The Act applies only to ground leases of commercial or industrial property owned by lessors, directly or indirectly, who own at least 50,000 square feet of commercial or industrial property in the State of Hawaii.  Haw. Rev. Stat. § 519-(b). "Commercial or industrial leasehold property" is land that is situated in Hawaii, is zoned for commercial or industrial use, and is subject to a lease with a term of ten years or more and an unexpired term of five years.  Id.  This law is in effect for one year only, from July 1, 2009 to June 30, 2010.  Under Act 189, any lease governed by Act 189 that requires renegotiated rent to be based at least in part on "fair and reasonable" annual rent must (1) be construed to require that the rent be fair and reasonable to both the lessor and the lessee; and (2) take into account "any and all relevant attendant circumstances relating to the lease," including the "uses and intensity of the use of the leased property during the term of the lease approved by the lessor."  Id. § 519-(a)(1)(B).

Given the detailed specifications in Act 189 concerning the square footage owned by a lessor (at least 50,000 square feet), type of property owned (commercial or industrial), duration of the lease (at least ten years), duration of the

12

unexpired lease term (at least five years), dates of rent
renegotiation (July 1, 2009, to June 30, 2010), and lease
language ("fair and reasonable" rent), HRPT, via its wholly owned
subsidiaries, is the sole landowner covered by the law.  See id.
§ (b)(4) (a lessor who directly or indirectly owns the requisite
amount of land is subject to Act 189); HRPT's Concise Statement
¶ 13.  HRPT thus stands alone in contesting Act 189, unaided by
other landowners, who, had they been affected by such
legislation, might have lent their political clout to urge defeat
of the bill.

          HRPT's lessees who themselves sublease HRPT property to
others are not necessarily required to charge "fair and
reasonable" rent that takes into account the factors that
appraisers are required by Act 189 to consider when setting rent
payable directly to HRPT.  An HRPT lessee who acts as a "master
lessee" by subleasing HRPT property to others is subject to those
factors only if the master lessee "agrees to comply with this
paragraph when determining the renegotiated sublessee rental
amount charged to a sublessee."  The master lessee "shall agree
to limit" rent to the lesser of "fair and reasonable" rent as Act
189 requires "fair and reasonable" rent to be determined when
payable directly to HRPT, or rent "as calculated under the
renegotiation or renewal provisions of the sublease."  Haw. Rev.
Stat. § 519-(a)(2).

About a month after Act 189 took effect, HRPT filed the
present lawsuit against Governor Lingle, challenging the Act as
unconstitutional.  CFV Lessees intervened in the action.  HRPT,
Lingle, and CFV Lessees filed a first round of motions for
summary judgment in late 2009.  Governor Lingle and CFV Lessees
argued that HRPT lacked standing to proceed, as it was unclear
how, and to what extent, the law would affect or injure HRPT.
This court denied all motions, ruling that additional evidence
was needed to determine whether HRPT had standing, an issue that
was inherently intertwined with whether Act 189 was
unconstitutional.  While the parties had focused in their initial
motions on the difference between what rents would have been
before Act 189 took effect and what rents would be under Act 189,
this court saw the issue differently.  The court stated, "[T]he
question before the court is whether, as HRPT claims, Act 189
changes the parties' original intent with respect to 'fair and
reasonable' rent, or whether, as Lingle and CFV assert, Act 189
only reinforces the parties' intent." HRPT Properties Trust, 676
F. Supp. 2d at 1044.  Accordingly, the court directed "further
discovery and briefing as to the intent of the contracting
parties." Id. at 1046.

The parties are now before this court with their second
round of summary judgment motions.  HRPT moves for summary
judgment, saying that it has evidence demonstrating that the

14

original parties to the leases intended that the term "fair and reasonable" be read as meaning market rent, without regard to the individual circumstances of or uses by the lessees.  HRPT argues that Act 189's requirement that appraisers consider the use of the land is a change from what the parties originally intended.

CFV Lessees argue that the original parties intended that appraisers consider a range of relevant factors, including rent that was reasonable to both parties.  CFV Lessees say that Act 189 only confirms the original parties' intent.

Governor Lingle argues that the language "fair and reasonable" is not at all ambiguous, and that the court is therefore barred from looking at extrinsic evidence such as the parties' intent when construing that provision.

There has been significant legislative action since this court issued its order in December 2009.  The Legislature, accepting the recommendations of the House of Representatives Committee on Economic Revitalization, Business, & Military Affairs and of the Senate Committee on Judiciary and Government Operations, extended the effect of Act 189 to 2013.  The House Committee reported that, although Act 189 is scheduled to sunset on June 30, 2010, "not all of the leases containing the terms 'fair and reasonable' have been renegotiated, and the last of these leases is scheduled to be reset in 2013."  H. 25-796, Reg. Sess., at 2 (Haw. 2010), attached as Ex. 22 to HRPT's Reply.

According to the Committee report, "The Act addresses concerns that the lessor is asking unreasonably high new rents at twice the market rate, and using the high costs of arbitration to force small business lessees to accept these terms without electing arbitration." Id. at 2.  The Senate Committee found that the purpose of Act 189, "to alleviate the economic burden on lessees of certain commercial and industrial properties by removing barriers to free and fair rent negotiations, remains relevant in the current economic climate."  S. 25-2399, Reg. Sess., at 1 (Haw. 2010), attached as Ex. 24 to HRPT's Reply.

In advocating for Act 189's extension, CFV Lessees testified, "With the passage of Act 189, Citizens for Fair Valuation had hoped that lessor, HRPT, would alter its business model."  Ex. 19 at 1, attached to HRPT Concise Statement.  CFV Lessees stated that Act 189 had to be extended "to remind HRPT that its contracts call for good faith negotiation and ultimately 'fair and reasonable rents.'  HRPT seems to have deliberately chosen to ignore Act 189 and the spirit of its commitments to its lessees and the legislators over these past several months."  Id. at 2.  The extension bill is now with Governor Lingle, awaiting her signature or other action.

III.     STANDARD OF REVIEW.

The Declaratory Judgment Act, 28 U.S.C. § 2201, is a procedural statute that provides a federal remedy for litigants

seeking a judicial declaration of rights.   It authorizes a court

to provide declaratory relief.  Brillhart v. Excess Ins. Co. of

Am., 316 U.S. 491, 494 (1942).   A court must first ensure that

there is an actual case or controversy before it, and, if an

actual case or controversy exists, must decide whether to

exercise its jurisdiction.  Principal Life Ins. v. Robinson, 394

F.3d 665, 669 (9th Cir. 2005); American States Ins. Co. v.

Kearns, 15 F.3d 142, 144 (9th Cir. 1994).

        Summary judgment shall be granted when "the pleadings,

the discovery and disclosure materials on file, and any

affidavits show that there is no genuine issue as to any material

fact and that the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(c).   One of the principal purposes of

summary judgment is to identify and dispose of factually

unsupported claims and defenses.  Celotex Corp. v. Catrett, 477

U.S. 317, 323-24, (1986).   Accordingly, "[o]nly admissible

evidence may be considered in deciding a motion for summary

judgment."  Miller v. Glenn Miller Prods., Inc., 454 F.3d 975,

988 (9th Cir. 2006).   A moving party has both the initial burden

of production and the ultimate burden of persuasion on a motion

for summary judgment.  Nissan Fire & Marine Ins. Co. v. Fritz

Cos., 210 F.3d 1099, 1102 (9th Cir. 2000).   The burden initially

falls on the moving party to identify for the court "those

portions of the materials on file that it believes demonstrate

the absence of any genuine issue of material fact." T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citing Celotex Corp., 477 U.S. at 323); accord Miller, 454 F.3d at 987.  "A fact is material if it could affect the outcome of the suit under the governing substantive law." Miller, 454 F.3d at 987.

When the moving party meets its initial burden on a summary judgment motion, the "burden then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue for trial." Miller, 454 F.3d at 987.  This means that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (footnote omitted).  The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Porter v. Cal. Dep't of Corr., 419 F.3d 885, 891 (9th Cir.2005) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, (1986)). "A genuine dispute arises if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." California v. Campbell, 319 F.3d 1161, 1166 (9th Cir. 2003); Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000) ("There must be enough doubt for a 'reasonable trier of fact' to find for plaintiffs in order to defeat the summary judgment motion.").

IV.      ANALYSIS.

A.      The Eleventh Amendment Does Not Bar Suit Against Governor Lingle.

Before proceeding to the merits, this court addresses an issue that goes to this court's subject matter jurisdiction over claims against Governor Lingle: whether the Eleventh Amendment, as Governor Lingle suggests, bars HRPT's suit against her.

Governor Lingle argues that the Eleventh Amendment bars HRPT's claims against her as a State of Hawaii official because Act 189 is self-enforcing and leaves her with no role in enforcement.  This court disagrees.

The Eleventh Amendment bars suits against a state in the absence of the state's consent.  Los Angeles County Bar Ass'n v. Eu, 979 F.2d 697, 704 (9th Cir. 1992); see Edelman v. Jordan, 415 U.S. 651, 662-63 (1974).  However, a party can sue a state officer in that officer's official capacity for prospective declaratory or injunctive relief if the officer has a sufficient connection to the enforcement of the law.  The Supreme Court has noted:

>  In making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, it is plain that such officer must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party.

Ex Parte Young, 209 U.S. 123, 157 (1908).  The Court has also

explained:

> The fact that the state officer, by virtue of
> his office, has some connection with the
> enforcement of the act, is the important and
> material fact, and whether it arises out of
> the general law, or is specially created by
> the act itself, is not material so long as it
> exists.

Id. at 158.  For an official's duty found in the general laws to

constitute a sufficient connection, the official must have the

"right and the power to enforce the statutes of the state,

including, of course, the act in question."  Id. at 161.

Courts have struggled to determine whether the

"connection" requirement is satisfied when that connection arises

by virtue of general enforcement obligations attendant to state

offices.  See Okpalobi v. Foster, 190 F.3d 337, 344 (5th Cir.

1999) ("Neither the Supreme Court nor the Fifth Circuit has

defined the exact nature of the 'connection' between a defendant

state officer and the enforcement of the statute required by Ex

parte Young."); see also Los Angeles Branch NAACP v. Los Angeles

Unified Sch. Dist., 714 F.2d 946, 953 (9th Cir. 1983) (noting

that the issue of whether a general obligation to enforce state

law satisfies the "connection" requirement "has been a subject of

much disagreement").

The Ninth Circuit has held that the connection between

an officer and the enforcement of an act "must be fairly direct;

a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision will not subject an official to suit." Eu, 979 F.2d at 704. Having said that, however, the Ninth Circuit in Eu permitted the Los Angeles County Bar Association's suit against California Governor Pete Wilson and Secretary of State March Fong Eu. The bar association had sued state officials, challenging the constitutionality of a California law prescribing the number of judges on the superior court for Los Angeles County. The bar association, arguing that the number was so low that inordinate delay in the handling of cases was a certainty, sought a ruling that the number was constitutionally required to be higher. The Ninth Circuit noted that Governor Wilson had "a duty to appoint judges to any newly-created judicial positions" and that Secretary of State Eu had "a duty to certify subsequent elections for those positions." The challenged statute was "not the type of statute that gives rise to enforcement proceedings," but the statute was "being given effect by state officials." Id.

Subsequently, the Ninth Circuit noted that a state official with "direct authority" and the "practical ability" to enforce a challenged statute could be sued. Nat'l Audubon Soc'y, Inc. v. Davis, 307 F.3d 835, 846 (9th Cir. 2002); see also Clark K v. Guinn, 2007 WL 1435428, *23 (D. Nev. 2007) (barring the plaintiffs' claims against the Governor when Nevada law placed

21

enforcement obligations specifically on other officials, leaving the Governor with only supervisory authority, not direct authority, over the enforcement of the law).  In the Audubon case, the plaintiffs challenged Proposition 4, a California law banning the use of certain kinds of traps and poisons used to capture or kill wildlife.  Concerned that the ban would increase the number of predators that preyed on birds, the Audubon Society filed suit and was joined by other interested parties.  The plaintiffs argued that Proposition 4 was preempted by federal law.  The Ninth Circuit held that suit against Governor Gray Davis and Secretary of Resources Douglas Wheeler was preempted, "as there is no showing that they have the requisite enforcement connection to Proposition 4."  However, the Ninth Circuit concluded that "the Eleventh Amendment does not bar suit against the Director of the California Department of Fish & Game, who has direct authority over and principal responsibility for enforcing Proposition 4."  Id. at 847.

This court turns to an examination of whether Governor Lingle similarly has direct authority over and principal responsibility for enforcing Act 189.  In conducting this examination, this court is following in the footsteps of other courts faced with this precise task:

> My reading of Young and the cases that follow it does not convince me that the thrust of Young can be limited to cases in which there is a showing of precise legal

machinery which a state official can use in
exercising his enforcement connection. . . .
Surely, if the court had intended to limit
the [Ex Parte Young] fiction to only those
officials having Real enforcement power, the
frequent use of the word "connection" is most
difficult to explain.

Looking at this troublesome problem
another way, if the Ohio Constitution
provided that the governor is charged with
the duty of Enforcement of all laws of Ohio,
arguably such a provision would be a general
grant of enforcement power, and well within
even a narrow reading of Young. However,
absent a constitutionally or statutorily
prescribed means to fulfill the enforcement
duty, the argument could be made that the
governor's enforcement powers are illusory,
not real. Given the hypothetical
constitutional mandate, however, it would be
an extremely narrow view to say that a
governor has no "connection" to the
enforcement of the laws of Ohio. Since I can
discern no real difference in the use of the
word "executed" in Article III, Section 6 of
the Ohio Constitution, from the use of the
word "enforce," I believe that the governor
does possess, by virtue of general Ohio law,
a "connection" to the enforcement of the Act.

Allied Artists Pictures Corp. v. Rhodes, 473 F. Supp. 560, 566

(S.D. Ohio 1979).

Governor Lingle contends that her generalized duty to

enforce Act 189 is not sufficient to allow suit against her.

This court disagrees, viewing Governor Lingle's role as similar

to that of Governor Wilson in Eu. That is, like Governor Wilson

in California, Governor Lingle is "giving effect" to the

challenged law. And like the Director of the Department of Fish

& Game in Audubon, Governor Lingle has direct authority over and

principal responsibility for enforcing Act 189. She therefore has a sufficient connection to the enforcement of the Act to subject her to suit.

The Hawaii Constitution requires her to faithfully execute the laws. See Haw. Const. art. V § 5. See NAACP v. State of California, 511 F. Supp. 1244, 1251, 1256 (E.D. Cal. 1981), aff'd, 711 F.2d 121 (9th Cir. 1983) (allowing suit against the Governor of California based on the Governor's obligation under the California Constitution to enforce or execute state laws). Additionally, every regulation made by any state agency is subject to approval by Governor Lingle. See Haw. Rev. Stat. § 91-3(c) ("The adoption, amendment, or repeal of any rule by any state agency shall be subject to the approval of the governor."). Governor Lingle decides whether and to what extent to enforce Act 189. She has the power to direct or prohibit enforcement, or to advise agencies or individuals to issue regulations, standards, or directives relating to Act 189. Any agency's regulation must be approved by Governor Lingle to be effective. These Hawaii provisions provide the requisite connection to subject her to suit. See Okpalobi, 190 F.3d at 346 (a governor's duty to see that the laws are faithfully executed is sufficient to allow suit against that official); Rhodes, 473 F. Supp. at 566; see also Young, 209 U.S. at 159 (noting that a court does not interfere with the general discretion of an officer when the court enjoins

24

an officer from taking action to enforce an unconstitutional law).

In finding Governor Lingle subject to suit, this court notes that Governor Lingle identifies no other state agency or official with authority to enforce Act 189. She has vigorously opposed HRPT's request that this court add as a party to this action the Director of the Department of Commerce and Consumer Affairs, who is charged with licensing and regulating appraisers. Governor Lingle's position is that that particular official has no role in enforcing Act 189. All the cases cited by both parties as establishing Governor Lingle's immunity involve at least one official who could be sued. Los Angeles Unified Sch. Dist., 714 F.2d at 952 (allowing claims against a superintendent to proceed); Davis, 307 F.3d at 847 (allowing suit against the Director of the California Department of Fish & Game); Eu, 979 F.2d at 704 (allowing suit against officials with a connection to a self-enforcing statute). If there is no state official charged with enforcing Act 189, then it stands to reason that Governor Lingle herself is the person with the power to instruct state officials in the executive branch to enforce or to refrain from enforcing Act 189.

Interestingly, while Governor Lingle claims that Act 189 is self-enforcing and that neither she nor any other state official will play any role in any administrative or judicial

proceeding involving appraisers accused of having flouted Act 189, here she stands in the present suit arguing zealously that Act 189 is constitutional and thus enforceable.  While she characterizes her argument on the constitutionality issue as an argument "in the alternative" (i.e., an argument made only in case this court rejects her Eleventh Amendment immunity argument), this court notes that, in the first round of summary judgment motions, she addressed the constitutionality issues without even mentioning the Eleventh Amendment.  And while she claims Eleventh Amendment immunity, she inexplicably asks that, if dismissed as a party, she be permitted to address the merits of the case as an amicus even while contending that Act 189 falls entirely outside her purview.

      In any event, she does not and cannot claim that, once she leaves office in less than a year, state officials would be prohibited by law from actively enforcing Act 189 by, for example, disciplining appraisers who openly refused to apply Act 189.  Such discipline could take the form of a refusal to renew a license, or of a suspension of a license.  State officials might refrain from taking such action under direction by the next governor.  But a voluntary decision not to exercise enforcement authority does not erase the existence of that authority.  See Davis, 307 F.3d at 846 (stating that, for purposes of sovereign immunity analysis, a court looks at whether a state official has

direct authority over and a practical ability to enforce the challenged law, not at the ripeness issue of whether the officer is threatening imminent enforcement).

In further support of her argument that Act 189 is not subject to state enforcement, Governor Lingle argues that Act 189 applies to appraisers only insofar as they act as arbitrators. She thus disclaims any role in enforcing Act 189 because the state does not license or otherwise regulate arbitrators.   In making this argument, Governor Lingle quotes from an order by Judge David Ezra in Wong v. John F. Chalmers 1990 Revocable Trust, Civ. No. 94-811 DAE (D. Haw. Jan. 24, 1996).   Judge Ezra opined in that order that three appraisers who set rent pursuant to lease terms "were acting as arbitrators, not as appraisers." Governor Lingle argues that, similarly, any appraisers determining rent payable under an HRPT lease would not be subject to discipline by the state, which licenses and regulates appraisers, but not arbitrators.  This argument misreads Judge Ezra's ruling.  Whether rent had to be set by appraisers in that case had been disputed, and a court order had issued compelling arbitration.  In characterizing the appraisers as arbitrators, Judge Ezra was rejecting a lessee's argument that the lessor had "disregarded the law by not following professional standards for appraisers."  In no way did Judge Ezra suggest that appraisers acting as arbitrators were free to ignore a statute imposing

27

requirements on appraisers.  When Judge Ezra said, "the fact that the arbitrators were required to be licensed appraisers is immaterial here," he was certainly not saying that arbitrators required to be licensed appraisers were unrestrained by statutory requirements applicable to appraisers.

Indeed, if Governor Lingle is saying that appraisers acting as arbitrators are free to ignore Act 189, this court is at a loss to understand why Governor Lingle is taking any position at all on the merits of Act 189's constitutionality. Governor Lingle cannot have it both ways, arguing that Act 189 is inapplicable to appraisers but that Act 189 constitutionally imposes requirements on appraisers when they act as arbitrators.

Given this court's determination that Governor Lingle is a proper party to this action, there is no need for this court to address HRPT's request that the Director of the Department of Commerce and Consumer Affairs be added to this action as the official charged with licensing and regulating appraisers.  That official would only act pursuant to Governor Lingle's direction with respect to Act 189.  Governor Lingle's position in this case and a submission by the Director suggest that any enforcement would flow from a policy decision reserved to Governor Lingle. Governor Lingle is therefore a proper party to this action. Given this court's determination, this court need not address HRPT's argument that Governor Lingle has waived Eleventh

Amendment immunity.

B.     HRPT Is Injured by Act 189.

Governor Lingle and CFV Lessees raise a second jurisdictional challenge to this action.  They argue that, as appraisers have not yet set rent under Act 189, HRPT cannot have been harmed by this Act.  Therefore, they say, any claim under Act 189 is not ripe.

A court must assure itself that there is an actual "case or controversy."  This determination requires an analysis of standing and ripeness.  Although ripeness contains a constitutional and prudential component, only the constitutional component is raised here.  The constitutional prong of ripeness often overlaps with the injury-in-fact prong of Article III standing.  See Thomas v. Anchorage Equal Rights Comm'n, 220 F.3d 1134, 1138 (9th Cir. 2000) (en banc) (referring to ripeness as "standing on a timeline"); see also id. at 1138-39 ("The constitutional component of the ripeness inquiry is often treated under the rubric of standing and, in many cases, ripeness coincides squarely with standing's injury in fact prong.").

The issue of whether HRPT has been injured by Act 189 not only goes to jurisdiction but is also inextricably intertwined with the merits of HRPT's claims.  This court concludes that HRPT is indeed already injured by Act 189.

In its prior ruling in this case, this court held that

whether HRPT has an injury sufficient to establish standing turns on whether Act 189 materially changes or destroys the intent of the parties that formed the leases.  If the contracting parties intended that appraisers consider the factors set forth in Act 189, HRPT is not harmed by Act 189.  If, however, the parties did not intend that the appraisers be required to consider factors set forth in Act 189, then Act 189 changes the expectations of the parties by requiring the appraisers to consider new matters. The latter suffices as an injury, whereas the former does not. HRPT Properties Trust, 676 F. Supp. 2d at 1044.

Implicit in the prior ruling is the conclusion that the lease language is ambiguous.  In opposing the present motion, Governor Lingle tries to refight this battle, arguing that, as the lease language is unambiguous, this court may not consider extrinsic evidence.  Whether language is ambiguous is a matter of law, and this court earlier ruled that the lease is ambiguous. The present motion is not an opportunity to ignore that prior ruling.  See HRPT Properties Trust, 676 F. Supp. 2d at 1044 (noting that when the contract is unclear the intent of the parties is a question of fact).

Nor is this court persuaded by Governor Lingle's argument that, if the lease is ambiguous, it must be construed against HRPT without regard to evidence of the parties' intent, as Damon Estate was allegedly the original drafter.  The Hawaii

30

Supreme Court has stated that, in construing a contract, a
court's principal objective is to ascertain and effectuate the
intent of the parties as manifested by the contract in its
entirety.[3]  If there is any doubt, the interpretation that "most
reasonably reflects the intent of the parties" must be chosen.
Univ. Of Haw. Prof'l Assembly v. Univ. of Haw., 66 Haw. 214, 219,
659 P.2d 720, 724 (1983) (quoting Haw. State Teachers Ass'n v.
Haw. Pub. Employment Relations Bd., 60 Haw. 361, 368, 590 P.2d
993, 998 (1979)).  The Hawaii Supreme Court has affirmed the
"general rule" that, in interpreting contracts, ambiguous terms
are construed against the party who drafted the contract.  Luke
v. Gentry Realty, Ltd., 105 Haw. 241, 249, 96 P.3d 261, 269
(2004).  However, to reconcile all of the Hawaii Supreme Court's
statements regarding construction of contracts, this court must
read that general rule as a rule of last resort, one that
typically applies only when other rules of interpretation have
failed to elucidate the contract's meaning.  See 11 Richard A.
Lord, Williston on Contracts § 32:12 (4th ed. 2009).  Otherwise,
the "general rule" might permit an interpretation contrary to
evidence of what even the drafter intended.  Only when a court
cannot determine the parties' intent (e.g., when the court must

---

[3] While the question of whether a contract was made is a
matter of federal law for purposes of analyzing an alleged
Contract Clause violation, a court may rely on general and local
law when determining the answer.  See General Motors Corp. v.
Romein, 503 U.S. 181, 187-88 (1992).

choose between two or more reasonable meanings offered by the original parties) is the rule properly invoked.  Id.

Two reasonable meanings of a contract's arbitration provision were before the Hawaii Supreme Court in Luke.  In that case, the plaintiffs had signed a sales agreement that contained an arbitration clause.  After suit was filed, the defendants moved to stay the case pending arbitration.  The circuit court granted the motion to stay, holding that the contract was unambiguous in mandating arbitration.  Luke, 105 Haw. at 245, 96 P.3d at 255.  The Hawaii Supreme Court held that the circuit court had erred because the contract was ambiguous as to whether the parties had intended to arbitrate the dispute.  The court impliedly held that both the plaintiffs' and the defendants' interpretations of the arbitration provision were reasonable, justifying construction against the drafter.  Id. at 249, 96 P.3d at 269.  This rule does not control when the intent of the parties clearly establishes the meaning of the contract.

HRPT's leases provide:

> If the Lessors and Lessee shall fail to reach agreement ninety (90) days before the commencement of any of the successive ten-year periods after the first ten (10) years of said term with respect to the net annual rent hereunder payable for such period, then said rent shall be such fair and reasonable annual rental of the demised land (exclusive of buildings) as shall be determined by three impartial real estate appraisers.

Ex. 1 at 12-13, attached to HRPT Concise Statement.

By contrast, Act 189 states, in part:

(1) Whenever a lease subject to this section provides for the renegotiation of the rental amount . . . during the term of the lease and the renegotiated rental amount or other recompense is based, according to the terms of the lease, in whole or in part on a "fair and reasonable" annual rent, that provision shall:

> (A) Be construed to require that the rent shall be fair and reasonable to both the lessor and the lessee to the lease; and

> (B) Take into account any and all relevant attendant circumstances relating to the lease, including:

>> (i) The uses and intensity of the use of the leased property during the term of the lease approved by the lessor; and

>> (ii) The surface and subsurface characteristics of the leased property and the surrounding neighborhood on the renegotiation date.

Haw. Rev. Stat. § 519-(a)(1). Because the term "fair and reasonable" appears only in the lease provision addressing the appraisal process (i.e., the process that applies when the parties fail to negotiate new rent between themselves), Act 189's requirements for construing the term "fair and reasonable" must apply only to the appraisal process.

The evidence before this court establishes that Act 189

injures HRPT by changing the lease.  The lease permitted the lessor to argue to appraisers that any reset rent should be market rent determined without regard to a lessee's actual use of the property or to the buildings on the property.  By requiring appraisers to consider the specific "uses and intensity of the use" of the property, Act 189 deprives the lessor of this argument.

The age of the leases in issue has made gathering evidence of the original contracting parties' intent a challenge. Damon Estate had leases dating back to 1949, a decade before Hawaii became a state.  The specific leases in issue in the present case were originally entered into in the 1960s and 1970s but borrow language from earlier leases.  See David M. Lepore Decl. ¶ 6 (Doc. No. 67-7) (stating that the average term of the leases was for fifty years, with, in 2003, an average remaining term of twenty-two years).  None of the Damon Estate Trustees involved in negotiating or drafting those leases is alive today. Nor has any original lessee been identified for this court as still living or available.

HRPT was able to locate a 1993 affidavit of one of the Damon Estate Trustees involved with the leases at issue here. That former Damon Estate Trustee, D. Hebden Porteus, "pretty much [wrote] the lease the way [he] wanted it written."  Ex. U at 626, attached to CFV Lessees' Concise Statement.  His affidavit states

34

that the term "fair and reasonable annual rent" was intended to mean "market rent," defined by multiplying the market rate of return by the fee simple value of the land.   Porteus Affid. ¶ 7. This determination was not to include the value of any structure or building on the land, as Damon Estate leased only the land. "As a ground lessor, only, the Estate's rents are not increased or decreased as a result of the value or age of the improvements the lessee may have elected to place on the property, nor are the lease rents affected by the lessee's track record or ability to make a profit operating the property." Id. ¶ 9.  As the leases state that appraisers will determine a "fair and reasonable" rent in the event the parties do not agree, it "was never the intent of the Estate that the rent would be decided by salespersons, economists or planners." Id. ¶ 8.

Porteus acknowledged that "[i]t was thus never the intent or understanding of the parties that 'fair and reasonable' rent be anything other than market rent, as any rent below market would be unfair and unreasonable to the Estate, while any rent above market would be similarly unfair and unreasonable to the lessee." Id. ¶ 6.  Clearly, however, Damon Estate intended that any fair and reasonable rent not take into account any structure on the land.

In addition, HRPT offers declarations from three present Damon Estate Trustees who have served as Trustees since

35

1982, 1985, and 1994, respectively.  They have been operating under the belief that Damon Estate "originally intended and understood the term 'fair and reasonable annual rent for the demised land (exclusive of buildings)' to mean market rent, defined by the highest and best use of the land and without regard to the use or profitability of an individual tenant." David M. Haig, Paul Mullin Ganley, Walter A. Dods, Jr. Decl. ¶ 3 (Doc. No. 67-5) (Feb. 8, 2010).  More importantly, they have always "understood that we had the right to argue to the impartial panel of appraisers that 'fair and reasonable' meant market rent, as defined above, and that Damon Estate had the right to have the real estate appraisers consider that argument based on their real estate expertise."  Id. ¶ 6.

One of those trustees, David M. Haig, declared in 1993 that Damon Estate offered rents that may have been below market during negotiations in accordance with its "business philosophy of offering rents lower than the Estate believes would likely result if the parties went through the arbitration process." Haig Decl. ¶ 4 (Doc. No. 80-15) (Jan. 8, 1993) Ex. CC, attached to CFV Lessees' Concise Statement.  In other words, according to Haig, while Damon Estate did offer lower rents in negotiations, it always intended to argue that rents should be market rent or higher if negotiations failed and the matter was resolved by appraisers.

36

Governor Lingle argues that, as the living Trustees do not state how they came to their understanding of the lease language, this understanding may be based on hearsay or speculation and so is inadmissible as evidence.  This court disagrees.  While not as persuasive as direct testimony by persons actually involved with the leases at the time the lease language was drafted, the living Trustees' statements go to Damon Estate's course of dealing.  This course of dealing is relevant to the construction of the lease, and the course of dealing is not based on speculation or hearsay.  See Amfac, Inc. v. Waikiki Beachcomber Inv. Co., 74 Haw. 85, 124-25, 839 P.2d 10, 31 (1992) (extrinsic evidence can be considered when the contract is ambiguous); Stewart v. Brennan, 7 Haw. App. 136, 141, 748 P.2d 816, 821 (1988) (noting that the course of dealing between the parties is a surrounding circumstance to be considered when a contract is ambiguous).

HRPT's evidence of intent turns out to be the only useful evidence in the record.  CFV Lessees provide no evidence raising a factual issue regarding intent.  Despite being an organization with numerous members with long-term Damon Estate leases, CFV Lessees offer nothing comparable to the evidence HRPT offers.  Indeed, CFV Lessees' evidence actually supports HRPT's construction of the lease language.

CFV Lessees submit an HRPT subsidiary's initial brief

submitted to an appraisal panel in 2006.  The brief states, "Fair and reasonable rent is determined by looking at rental rates entered into in transactions for comparable properties around the same time."  Ex. X at 6, attached to CFV Lessees' Concise Statement.  The brief lists market rental rates of nearby properties to establish the "true market rent" of the property at issue.  Id. at 7.  It states, "The lease provides the rent shall be set at a fair and reasonable rate.  This ensures that the lessee will not be paying excessive rent, and the lessor will not be receiving below-market rates to compensate it for its investment in the property."  Id. at 8.  While consistent with the concept articulated in both Porteus's affidavit and Act 189 of rent that was fair to both the lessor and the lessee, the brief does not suggest that the appraisers were to consider the specific use to which a lessee put leased property.  To the contrary, the lessor's reply brief, submitted to appraisers in response to the lessee's brief, takes issue with the lessee's focus on its specific use.  The brief states that the lessee seeks "an adjustment for conditions of the lease" and urges the appraisers not to make an adjustment.  Ex. KK at 2, attached to CFV Lessees' Concise Statement ("absent a showing by [lessee] of what terms of the . . . lease differ and why those differences warrant an adjustment in rental rate, there is no basis for the Panel to consider such an adjustment").  Thus, HRPT's 2006 briefs

are consistent with the position HRPT takes in this lawsuit.

At the hearing on the present motions, CFV Lessees pointed to their Exhibit LL as evidence that Damon Estate intended that a lessee's actual use of leased property be considered in setting rent.  Exhibit LL is a 1992 report by a consulting company retained by Damon Estate explaining its calculation of "fair and reasonable annual rent for the demised land."  Contrary to CFV Lessees' characterization, the report does not establish that the consultant considered the lessee's actual use, much less that Damon Estate advocated such consideration.  Instead, the consultant calculated its rent estimation by analyzing "comparable lease negotiations," comparable land transactions, and the generalized use of the property if put to its general best use.  Ex. LL at 17, attached to CFV Lessees' Concise Statement.  There is no indication that the consultant considered the specific use to which the lessee put the property.  The "market rate of return on land" section of this report states, "Ground leases in Hawaii are typically based on a rate of return on the market value of the demised land . . . .  The prevailing rate of return expectation on industrial as well as commercial land in Hawaii was obtained by surveying major land owners and examining recent lease documents."  Id. at 25. Thus, the consultant based its rent determination on a standard expected rate return, not on the specific use or intensity of use

39

of the property.

Similarly unhelpful to CFV Lessees is a letter it submits from a lessee's attorney. Writing in 1992, the attorney describes the negotiation process:

> [T]here was disagreement between the lessees and Damon Estate regarding the meaning of [fair and reasonable annual rent]. Damon Estate contended that the market-rate of return should be applied to the unencumbered fee value of the property as if vacant and unimproved. We contended that the rent should be set based upon the earning power of the property based upon its existing use.

Ex. S, attached to CFV Lessees' Concise Statement. As Act 189 applies only to the appraisal process entered into when the parties fail to agree, the parties' negotiating positions outside of the appraisal process are irrelevant to the matter now before this court. Even assuming this letter is admissible, it is unhelpful to CFV Lessees. The letter shows that, even in negotiations outside of the appraisal process, Damon Estate contended that rent should not be affected by the existing use of leased property.

The same Damon Estate position is reflected in letters Damon Estate Trustees sent to many lessees in 1992. The letters recognize that "there have been sales of comparable property that have been higher, indicating that a higher rent is supportable," but state that the Trustees will argue to appraisers that "a fair and reasonable annual rent for the demised land (exclusive of

buildings) . . .  should be [a certain amount]."  Exs. Y, Z, AA,

BB, attached to CFV Lessees' Concise Statement.  In other words,

while sometimes agreeing to below-market rents during

negotiations, Damon Estate reserved the right, if negotiations

were unsuccessful and the appraisal process applied, to seek a

fair and reasonable rent that did not take into account a

lessee's specific structures or use.

        The court does not find relevant to the present dispute

a lessee's declaration stating that, in setting rent, Damon

Estate "did not always rely on a valuation based on the highest

and best use of the land."  Ian Cordes Decl. ¶ 18 (Doc. No. 80-4)

(Apr. 19, 2010).  The rent referred to by the lessee was rent

negotiated between the parties, not rent set by appraisers.

Damon Estate's business decisions during negotiations in no way

limited arguments Damon Estate intended to make if negotiations

failed and the appraisal process then applied.

        The evidence before this court establishes that, in the

context of the appraisal process, Damon Estate always intended to

argue that "fair and reasonable rent" was market rent that did

not consider a lessee's specific use of the leased property.

        Governor Lingle argues that any "market rent"

necessarily includes consideration of specific lessee use.  She

points to the following language from the Uniform Standards of

Appraisal Practice Manual as establishing that appraisers must

41

consider lessee use when setting rent:

> When necessary for credible assignment
> results in developing a market value opinion,
> an appraiser must: (a) identify and analyze
> the effect on use and value of existing land
> regulations, reasonably probable
> modifications of such land use regulations,
> economic supply and demand, the physical
> adaptability of the real estate, and market
> area trends.

Ex. 2, attached to HRPT's Concise Statement (Sept. 28, 2009).

Governor Lingle focuses on the requirement that appraisers

consider "economic supply and demand," noting that a lessee's use

affects the revenue it generates, and in turn the price the

lessee is willing to pay, going directly to "economic demand."

But it is a leap for Governor Lingle to conclude that

consideration of generic demand equates with a specific lessee's

actual use of leased land.  The quoted USAPM language does not

get Governor Lingle to Act 189.

Governor Lingle and CFV Lessees make another untenable

leap in arguing that Act 189 does not harm HRPT because the lease

language does not expressly prohibit the appraisers from

considering the factors Act 189 requires them to consider.  In

making this argument, Governor Lingle and CFV Lessees appear to

be relying on the provision in Act 189 stating that its

requirements apply "unless expressly stated to the contrary in

the lease."  See Haw. Rev. Stat. § 519-(a).  Admittedly, the

lease language does not "expressly" state that a lessee's

specific use may not be considered by appraisers.  However, the lease language suggests that such specific use need not be considered, as the lease directs appraisers to determine the "fair and reasonable annual rental of the demised land (exclusive of buildings)."  The buildings erected by a lessee clearly relate to the lessee's specific use of the land.  Act 189 requires the appraisers to consider the lessee's use of the property.  Under Act 189, HRPT cannot even credibly argue to appraisers that a specific lessee's use of leased land is irrelevant to renegotiated rent.

While CFV Lessees argue that the appraisers previously had "no limitations regarding the factors they [could] consider during an appraisal procedure," CFV Lessees' Motion at 12, Act 189 does not simply repeat the options available to appraisers under the lease.  Under Act 189, appraisers must consider the actual use to which a lessee puts leased property.  This is a requirement that did not exist before Act 189 took effect.

The evidence establishes that Act 189 has worked a material change of the lease, depriving HRPT of even the opportunity to urge appraisers to ignore a lessee's actual use of leased land in setting rent.  HRPT is deprived of the benefit of the bargain it entered into and is thereby injured.[4]

_____

[4] There is no dispute that the causation and redressability prongs of standing are also satisfied.  HRPT's injury is caused by Act 189's passage.  CFV Lessees played an essential role in

This court's determination that Act 189 changed the contracting parties' bargain is supported by the legislative history indicating that a change was exactly what was intended. Notwithstanding the language in Act 189 that it seeks to address "some of the burdensome or vague provisions of existing commercial and industrial leases of certain lands within urban districts by clarifying provisions," much more than "clarification" was intended by the proponents of Act 189. Numerous lessees who urged the Legislature to pass Act 189 noted that they were seeking to reduce the rents they had to pay HRPT. Voss Decl. ¶ 6 (Doc. No. 67-10).  The Legislature itself, in recently passing an extension of Act 189, noted in a report by the House of Representatives Committee on Economic Revitalization, Business, & Military Affairs that the extension "addresses concerns that the lessor is asking unreasonably high new rents at twice the market rent."   H. 25-796, Reg. Sess., at 2 (Haw. 2010), attached as Ex. 22 to HRPT's Reply.

This court is, of course, well aware that individual witnesses testifying before a legislature, as well as individual statements by legislators and even legislative committee reports, are not necessarily dispositive of the intent of a legislative body as a whole.  Bennett v. Yoshina, 98 F. Supp. 2d 1139 (D.

advocating for passage of Act 189.  Governor Lingle then allowed the Act to become law and now argues for its application.  This is a harm redressable by this court.

Haw. 2000), aff'd on other grounds, 259 F.3d 1097 (9th Cir.

2001).  This court cannot help noting, however, that the

legislative history indicating an intent to change the parties'

bargain is entirely consistent with this court's conclusion that

Act 189 did indeed effect such a change.

C.        Act 189 Violates the Contract
          Clause.

The court turns now to the question of whether the

injury to HRPT violates any constitutional provision.

The Contract Clause of the United States Constitution

states, "No State shall . . . pass any . . . Law impairing the

Obligation of Contracts."  U.S. Const. art. I § 10, cl. 1.

Whether a regulation violates the Contract Clause is governed by

a three-step inquiry.  The first inquiry concerns "whether the

state law has, in fact, operated as a substantial impairment of a

contractual relationship."  RUI One Corp. v. City of Berkeley,

371 F.3d 1137, 1147 (9th Cir. 2004) (internal quotations

omitted).  This threshold inquiry itself has three components,

the first being "whether there is a contractual relationship."

Id. (internal quotations omitted).  This component goes not just

to whether there is any contractual relationship between the

parties, but to whether there is a "contractual agreement

regarding the specific . . . terms allegedly at issue." Romein,

503 U.S. at 187.  The second component looks at whether a change

in the law impairs that contractual relationship.  The third

45

component concerns whether the impairment is substantial.  Id. at 186.

If this three-component threshold inquiry results in a finding that a law has substantially impaired a contractual relationship, a court must address the second inquiry, which concerns whether "the State, in justification, has a significant and legitimate public purpose behind the regulation, such as the remedying of a broad and general social or economic problem." RUI One Corp., 371 F.3d at 1147 (brackets and citations omitted). The final inquiry concerns "whether the adjustment of the rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption." Id. (quotations omitted).  If a state is not a party to the contract, a court employs less scrutiny in addressing the third inquiry. See id. at 1152 (noting that courts apply decreased deference for self-interested government acts only upon reaching the third part of the Contract Clause analysis).

        1.      Act 189 Substantially Impairs
                HRPT's Contractual Relationship
                with Lessees.

Act 189 substantially impairs the contractual relationship between HRPT and its lessees.  The first component of this initial inquiry (addressing whether there is a contractual agreement regarding the specific terms at issue) is

clearly satisfied.  HRPT and the lessees have a lease requiring appraisers to set "fair and reasonable annual rental of the demised land (exclusive of buildings)."  Ex. 1 at 13, attached to HRPT Concise Statement.  The second component (whether a change in the law impairs the contractual relationship) is also satisfied.  As noted in the preceding discussion, Act 189 impairs the contract by stripping HRPT of even the right to urge appraisers to set rent without regard to a specific lessee's actual use of the leased property.  The court therefore focuses on the third component, which looks at whether the impairment is substantial.

An impairment of a contract is substantial if it deprives a private party of an important right, thwarts performance of an essential term, defeats the expectations of the parties, or alters a financial term.  S. Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 890 (9th Cir. 2003).  A court must focus on "the importance of the term which is impaired, not the dollar amount," when determining substantiality.  Id. at 892.  Thus, if a law completely destroys contractual expectations, a severe impairment exists, but if a law only restricts a party to gains it reasonably expected from the contract, no substantial impairment exists.  Energy Reserves Group, Inc. v. Kansas Power & Light, 459 U.S. 400, 411 (1983); Cont'l Ill. Nat'l Bank & Trust Co. v. Washington, 696 F.2d 692, 700 (9th Cir. 1983) (noting that

47

a severe impairment exists when state regulation "defeats the expectations of the parties under their contracts").  The Supreme Court notes:

> The severity of an impairment of contractual obligations can be measured by the factors that reflect the high value the Framers placed on the protection of private contracts.  Contracts enable individuals to order their personal and business affairs according to their particular needs and interests.  Once arranged, those rights and obligations are binding under the law, and the parties are entitled to rely on them.

Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 245 (1978).

Act 189 strips HRPT of a right regarding an important, if not central, provision of the leases.  The Act precludes HRPT from even asking appraisers to calculate rent without regard to a lessee's actual use of leased property.  Act 189 requires appraisers to "take into account any and all relevant attendant circumstances relating to the lease," including "uses and intensity of the use of the leased property."  Haw. Rev. Stat. § 519-(a)(1)(A)(ii).  This new requirement goes to a central provision of the lease: determination of rent and the financial obligations of both parties.  The establishing of rent is always an important term in a lease; rent sets the financial obligations of the parties.  Adjustments in financial terms are substantial impairments.  See Univ. Of Haw. Prof'l Assembly v. Cayetano, 183 F.3d 1096, 1100 (9th Cir. 1999).

48

A court must also consider "whether the industry the complaining party has entered has been regulated in the past." Campanelli v. Allstate Life Ins. Co., 322 F.3d 1086, 1098 (9th Cir. 2003) (internal quotations omitted). If the industry has been heavily regulated, then the impairment is less severe because "one whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them." Id. (internal quotations and brackets omitted). In this case, the "industry" at issue is the long-term leasing of commercial and industrial property. Nothing in the record before this court suggests that either the state or the federal government has previously subjected leases of the type in issue here to any regulation of the rents to be charged. CFV Lessees' example of State of Hawaii law concerning residential land ownership is inapposite. See Haw. Rev. Stat. § 516-83 (noting that the refusal of landowners to sell land has resulted in a shortage of fee simple residential land and an artificial inflation of residential and land values in the state). Quite apart from the difference between residential and commercial contexts, that law says nothing about how specific lease language is to be construed. For that reason, CFV Lessees' reference to rent-control laws is similarly unavailing.

Indeed, an examination of state law concerning rent calculations has led the court to a state statute requiring that

the renegotiation of rent under a lease be based "upon the use to which the land is restricted by a lease document."  Haw. Rev. Stat. § 519-1.  By contrast with Act 189, this statute clearly states that lease language must be implemented.

As Act 189 substantially impairs HRPT's contractual rights, the court turns to the second prong of the Contract Clause analysis.

> 2.      Act 189 States a Legitimate Public
>         Purpose.

The second prong of Contract Clause analysis focuses on whether there is a legitimate purpose behind the challenged law.  Because Act 189 substantially impairs preexisting contractual rights, Act 189 cannot survive absent a significant and legitimate public purpose.  It must protect a "broad societal interest rather than a narrow class" to ensure that the state is exercising its police power rather than benefitting a special interest.  See Spannaus, 438 U.S. at 249.

The stated purpose of Act 189, in general, is to "stabilize Hawaii's economy."  Stabilizing the state economy is a significant and legitimate public purpose and relates to a "broad society interest."  Thus, the articulated goal of Act 189 presents no constitutional impediment.

> 3.      Act 189 is Not Reasonably Designed
>         to Promote Any Public Purpose
>         Justifying Its Adoption.

"Once a legitimate public purpose has been identified,

the next inquiry is whether the adjustment of the rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption." <u>Energy Reserves Group, Inc.</u>, 459 U.S. at 412 (internal brackets and quotations omitted).  This court concludes that Act 189 is not reasonably designed to promote any legitimate public purpose.

This court does not lightly reach this conclusion.  The court is acutely aware that it must exercise deference to a legislative finding as to the necessity or reasonableness of a particular measure.  <u>See</u> <u>id.</u>  One challenging a law bears the burden of proving that legitimate government interests do not justify the resulting impairment.  <u>In re Seltzer</u>, 104 F.3d 234, 236 (9th Cir. 1996).

HRPT meets its burden of proving that Act 189 is not reasonably designed to further the Act's stated purpose.  Act 189 purports to be aimed at stabilizing Hawaii's economy.  This general purpose is broken down by Act 189 into three subpurposes, none of which is actually addressed by the Act.

First, Act 189 says that it aims to stabilize the economy by keeping small businesses in urban environments so that consumers have easy access to those businesses.  The text of Act 189 itself includes the Legislature's finding that small businesses "supply services and products to the communities

51

within or adjacent to the commercial and industrial properties." Act 189 goes on to note, "Without these neighborhood businesses, consumers would be compelled to travel long distances and expend large amounts of time and effort to locate these needed services and products." That purpose is not reasonably furthered by Act 189.

CFV Lessees urged the Legislature to pass Act 189 to protect lessees that were "captives" to long-term leases. This record suggests that the Legislature was actually concerned more about lessees than about consumers. In any event, it makes no sense to try to keep businesses in urban areas by regulating a single landowner with leases having terms of at least ten years and unexpired terms of at least five years scheduled for rent renegotiation between July 1, 2009, and June 30, 2010. The record does not indicate that the "consumers" served by HRPT's lessees are primarily or uniquely in urban areas, or that HRPT's lessees are small businesses more than ordinarily likely to move to rural areas. No reason is proffered for focusing on certain HRPT lessees to prevent a general exodus of small businesses out of urban areas. In fact, it is not even clear that the particular HRPT lessees affected by Act 189 all qualify as small businesses. Of course, the Legislature need not state any evidentiary findings, but Act 189 does indeed contain several paragraphs purporting to state such findings, none of which

indicates that it applies to the circumstances of any specific
lessee affected by Act 189.

And while Act 189 mentions the Legislature's concern
that industrial jobs are shifting away from the "primary urban
center," it does not define that term.  The City of Honolulu uses
the term "primary urban center" to describe a large area
stretching from Waialae Kahala to Pearl City and from the
shoreline to the westerly slopes of the Koolau Mountains.  <u>See</u>
Primary Urban Center Development Plan, Chapter 1 at 1-1,
<u>available at</u> Honolulu City and County Department of Planning and
Permitting website, http://www.honoluludpp.org/
planning/DevSust_PrimaryUrbanCenter.asp (last visited May 28,
2010)(attached as a separate filing in the case file for the
present action).  This broad area includes land subject to
innumerable commercial and industrial leases.  Even a major
landowner like HRPT is hardly likely to hold a majority of those
leases.  To stem a shift of industrial jobs out of this broad
area, any law should affect at least some significant proportion
of those leases.  As passed in 2009, Act 189 does not affect all
of even HRPT's leases.  It affects only those scheduled for rent
adjustment between July 1, 2009, and June 30, 2010.

Second, Act 189 purports to help small businesses that
often depend on commercial or industrial leases, as small
businesses are "an essential element in strengthening and

diversifying Hawaii's economy and creating jobs for our people."
That purpose is not reasonably furthered by Act 189.  If the
Legislature wants to stabilize the economy by helping small
businesses in general, there is no reason to pass a law
applicable to only a landowner owning more than 50,000 square
feet of commercial or industrial land that is subject to leases
with terms of ten years, unexpired terms of at least five years,
leases referring to "fair and reasonable" rent, and rent
renegotiations scheduled for the period between July 1, 2009, and
June 30, 2010.  HRPT, the one landowner covered by Act 189, does
not own all, half, or even a quarter of the property on which
Hawaii's small businesses operate.  Even if it did, not all of
its leases are affected by Act 189, as enacted in 2009.  The 2009
enactment covers rents scheduled to be reset during a single year
beginning on July 1, 2009.  The Legislature is free to take any
number of steps to protect small businesses in general, but
regulating the rent that a single lessor may charge to specific
lessees whose rent is scheduled to be reset during one particular
year is a wholly unreasonable way to protect small businesses in
general.

      With respect to this second subpurpose of helping small
businesses, Act 189 also appears to be designed to level the
playing field between lessor and lessee.  Thus, Act 189 speaks of
lease provisions that are "vague or onerous" and that "eventually

force these businesses to relocate."  Governor Lingle echoes this thought, saying, "[B]ecause large landowners are more likely to wield inordinate bargaining power in renegotiating lease rents[,] . . . lowering their rents will naturally have the greatest impact on statewide tenant costs.").  Lingle Motion at 27.  Of course, Act 189 has no effect on the negotiations of the parties themselves; Act 189 only affects what appraisers may consider.  Even if Act 189 could be said to adjust the balance of power between the lessor and lessee, such an adjustment is not a legitimate aim of any statute that substantially impairs an existing contract.  See Anthony v. Kualoa Ranch, Inc., 69 Haw. 112, 123, 736 P.2d 55, 63 (1987).

In McDonald's Corp. v. Nelson, 822 F. Supp. 597, 608 (S.D. Iowa 1993), the court examined this very issue in the context of an Iowa law regulating franchises.  The law gave a franchisee the right to assign its interest without the franchisor's consent, as well as a right of first refusal if the franchisor opened another franchise near the franchisee.  It also limited a franchisor's ability to refuse to renew a franchise.  The plaintiffs were franchisors who argued that the law impaired their existing contracts, under which franchisees were restricted in transferring or assigning their interests, and franchisors were allowed to select who would operate new franchises.  Id. at 601-02.  Noting that the purpose of the Iowa law was to equalize

bargaining power, promote fair dealing, and protect franchisees from fraudulent and abusive practices by franchisors, the court concluded that the law failed to further any broad societal purpose, as it only applied to specific parties in existing contracts.  As the articulated overall purpose of the act was "specifically to adjust the balance of power between contracting parties," that purpose was not a broad societal interest justifying the impairment of the existing contracts.  Id. at 608-09.  Similarly, here, if the purpose of Act 189 is to level the playing field between HRPT and its lessees, that purpose does not address any broad societal purpose.

Further undermining the efficacy of Act 189 in leveling any playing field is its provision concerning master lessees. Under Act 189, a master lessee (a lessee that subleases land to a sublessee) is subject to the requirements of Act 189 only if the master lessee "agrees to comply with this paragraph when determining the renegotiated sublease rental amount charged to a sublessee."  The master lessee "shall agree to limit any sublease rental amount renegotiated or renewed" to the lesser of the "fair and reasonable" rent as it would be calculated for HRPT or "[t]he rental amount as calculated under the renegotiation or renewal provisions of the sublease."  Haw. Rev. Stat. § 519-(a)(2).  If Act 189 seeks to level the playing field for small businesses in general, it is difficult to see why master lessees, who

56

presumably hold more power than sublessees, are not bound in the same manner as HRPT is.

The Legislature's legitimate purpose of stabilizing the economy must be served by legitimate means. Statements by Governor Lingle herself establish the illegitimacy of Act 189. She claims that the goal of stabilizing the state's economy is "reasonably promoted by limiting small business tenant lease rents." Lingle Motion at 26. But limiting rents by changing the obligations of specific parties to a contract clearly violates the Contract Clause. The State of Hawaii Attorney General previously noted that, "while section 1 of the bill describes the need to strengthen and diversity Hawaii's economy, there is no evidence that this bill will achieve the stated purpose to stabilize the economy by addressing some of the burdensome provisions of existing commercial and industrial leases." Ex. 15, attached to HRPT Concise Statement. As the Hawaii Supreme Court said in examining the constitutionality of a different law, "This statute, as applied to leases already in effect, purely and simply, is an attempt by the legislature to change contractual remedies and obligations, . . . without relation to the purposes of the [act]." Kualoa Ranch, Inc., 69 Haw. at 124; 736 P.2d at 63.

Act 189's third stated subpurpose in furtherance of stabilizing the economy is to help small businesses especially

"during the United States' current recessionary period." Act 189 attempts to control rents that will be reset between July 1, 2009, and June 30, 2010. These rents will remain in effect for the next ten years, although it is not at all clear that the "current recessionary period" will extend that long. Moreover, the Legislature has just passed a three-year extension of Act 189. If Governor Lingle signs this extension into law, rents extending to 2023 will be affected, purportedly also as a way to address the "current recessionary period." The legislative committees were very much aware that more HRPT leases would be affected by this extension. See H. 25-796, Reg. Sess., at 2 (Haw. 2010)(House Committee report noting that "your Committee has amended this bill by changing the sunset date . . . to allow the Act to expire one year after renegotiation of the last lease commences"), attached as Ex. 22 to HRPT's Reply . This court has no reason to conclude that the "current recessionary period" will have any relevance at all in 2020 or, if the extension is signed into law, in 2023!

Because Act 189 does not reasonably or justifiably further the legitimate purpose of stabilizing Hawaii's economy, Act 189 violates the Contract Clause. That is, to borrow the Ninth Circuit's language, Act 189 does not provide for "reasonable conditions" for meeting the legitimate purpose of stabilizing Hawaii's economy and is not "of a character

58

appropriate to the public purpose." See RUI One Corp., 371 F.3d at 1147.

            D.        Act 189 Also Violates the Equal Protection Clause.

Act 189 also violates the Equal Protection clause by unfairly targeting HRPT.

The Equal Protection Clause protects persons from a state's intentional and arbitrary discrimination and strives to ensure that all persons similarly situated are treated alike. Village of Willowbrook v. Olech, 528 U.S. 562, 565 (2000); City of Cleburne v. Cleburne Living Ctr, 473 U.S. 432, 439 (1985). Individuals that constitute a "class of one" are protected by this clause. Village of Willowbrook, 528 U.S. at 564; SeaRiver Maritime Fin. Holdings, Inc. v. Mineta, 309 F.3d 662, 679 (9th Cir. 2002). When a state action does not implicate a fundamental right or a suspect classification, the plaintiff can establish a "class of one" claim by demonstrating that it alone "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Village of Willowbrook, 528 U.S. at 564; see N. Pacifica LLC v. City of Pacifica, 526 F.3d 478, 486 (9th Cir. 2008). The class of one theory is unusual, as a plaintiff need not show that a defendant discriminated against a group with whom the plaintiff shares similar characteristics, but rather that a defendant harbors animus against the plaintiff in particular and

59

has treated the plaintiff arbitrarily.   <u>Lazy Y Ranch Ltd. v.</u>
<u>Behrens</u>, 546 F.3d 580, 592 (9th Cir. 2008).

          The first step in Equal Protection Clause analysis is
to identify the classification imposed by a defendant.   The
second step examines whether there is a rational basis for the
classification.   <u>Id.</u>

          Act 189 singles out and targets HRPT.   HRPT and its
wholly owned subsidiaries are the only landowners within the
purview of Act 189.   Despite specific inquiry by the court during
hearings, no party has identified any other landowner that owns
more than 50,000 square feet of commercial or industrial
property, has ground leases with terms of at least ten years and
unexpired terms of at least five years, has leases that require
appraisers to determine "fair and reasonable" rent, and has
leases requiring the resetting of rent between July 1, 2009, and
June 30, 2010.   The legislative record is rife with comments
showing that Act 189 was specifically aimed at HRPT.   Numerous
legislators and advocates referred to HRPT in connection with Act
189.   Before Act 189 was passed, Governor Lingle objected to Act
189 as targeting a single landowner for the benefit of its
lessees.   The three-year extension was recommended for passage
precisely because HRPT had not completed all rent renegotiations.
There is no question that, under Act 189, HRPT is being
intentionally treated differently from all other landowners in

Hawaii.

The question is therefore whether there is a rational basis for this disparate treatment of HRPT.  Disparate treatment will survive rational basis scrutiny "as long as it bears a rational relation to a legitimate state interest."  Patel v. Penman, 103 F.3d 868, 875 (9th Cir. 1996).  Under this standard, a state "may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational."  Cleburne Living Ctr., 473 U.S. at 446; see Lockary v. Kayfetz, 917 F.2d 1150, 1155 (9th Cir. 1990) (noting that the rational relation test will not sustain malicious, irrational, or plainly arbitrary conduct).  However, courts are compelled to accept a legislature's classification "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."  Heller v. Doe, 509 U.S. 312, 321 (1993) (citation and quotation marks omitted). While a court should not inquire into the actual purpose of the challenged classification, a court need not accept a legislature's characterization of what classification it made. Behrens, 546 F.3d at 589.  Indeed, a plaintiff may rebut facts underlying a defendant's rationale for a classification to show that the challenged classification could not reasonably be viewed to further any purpose.  Id. at 591.  If "the constitutional conception of 'equal protection of the laws' means anything, it

61

must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." United States Dep't of Agric. v. Moreno, 413 U.S. 528, 534 (1973).

This court is hard pressed to identify a rational basis for the Legislature's distinction between HRPT and other large commercial landowners. See Behrens, 546 F.3d at 590 (noting that even when the classification is clear, plaintiffs may challenge the legitimacy of defendants' asserted rationale for any classification). As discussed above, Act 189 is not a legitimate means of meeting the legitimate stated goal of stabilizing Hawaii's economy. Neither Governor Lingle nor CFV Lessees offer any rationale other than what is stated in Act 189 itself, a subject addressed earlier in this order. Governor Lingle merely refers to HRPT's inordinate bargaining power. See Lingle Motion at 27-28; Motion at 27 (Nov. 19, 2009). However, numerous other landowners have long-term commercial or industrial leases and exercise similar power over lessees but remain untouched by Act 189. Most famously, Kamehameha Schools (formerly known as Bishop Estate) has vast landholdings far exceeding HRPT's, including huge commercial and industrial properties, but is not affected by this law. This court need not speculate as to how other large landowners have avoided being affected. This court instead need only note that no one has advanced any rational reason, and the

court cannot imagine one, that, out of all landowners, HRPT alone is targeted by Act 189.

In limiting itself to lessors owning 50,000 or more square feet of commercial or industrial land in Hawaii, leases lasting at least ten years with unexpired terms of at least five years, leases requiring appraisers to determine "fair and reasonable" rent, and rent renegotiations scheduled between July 1, 2009, and June 30, 2010, Act 189 is deliberately tailored to cover only HRPT's leases. As this specific classification is not a rational means of stabilizing Hawaii's economy, Act 189 violates the Equal Protection Clause.

V.        CONCLUSION.

Act 189 violates the Contract Clause and the Equal Protection Clause of the United States Constitution. This conclusion makes it unnecessary for this court to consider HRPT's arguments that Act 189 additionally violates other constitutional provisions or that HRPT is entitled to any further declaratory judgment or to injunctive relief. The court grants HRPT's motion for summary judgment and denies both Governor Lingle's second counter motion for summary judgment and CFV Lessees' counter motion for summary judgment.

The Clerk of Court is directed to enter judgment for HRPT and to close this case.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii May 31, 2010.



/s/ Susan Oki Mollway
Susan Oki Mollway
Chief United States District Judge

HRPT Properties Trust et al, v. Lingle and Citizens for Fair Valuation, 09cv00375 SOM/KSC; ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, DENYING DEFENDANT LINDA LINGLE'S SECOND COUNTER MOTION FOR SUMMARY JUDGMENT, AND DENYING INTERVENOR-DEFENDANT CITIZENS FOR FAIR VALUATION'S COUNTER MOTION FOR SUMMARY JUDGMENT